James McCORMICK, Appellant,

v.

Walter GULLETT, Appellee.

Court of Appeals of Kentucky.

Nov. 27, 1970.

**814**

P. H. Vincent, Edwin D. Rice, Ashland, for appellant.

J. W. McKenzie, Earle W. Moffitt, Eldon Webb, Ashland, for appellee.

PALMORE, Judge.

In Gullett v. McCormick, Ky., 421 S.W. 2d 352 (1967), a summary judgment dismissing the personal injury claim of Walter Gullett against James McCormick was reversed with directions that a trial be had. The ensuing trial resulted in a verdict and judgment awarding Gullett $8,000. McCormick appeals.

Before outlining the facts of the case we shall first dispose of appellant's contention that a prejudicial error occurred in the selection and empaneling of the jury.

During the voir dire examination one of the prospective jurors disclosed that for a number of years he had worked with the defendant, McCormick, at the Armco plant. Counsel for the plaintiff, Gullett, mistakenly identified this prospective juror as Rice, whereas in fact his name was Trimble. Pursuant to KRS 29.-270 each party exercised his right of peremptory challenges by striking names from the list of 18 prepared by the clerk, and the first 12 not stricken were called to the jury box. Plaintiff's counsel, having stricken the name of Rice, then observed the man they thought was Rice in the jury box, and upon inquiry discovered their mistake, brought it to the attention of the court, and moved that the panel be re-submitted for peremptory challenges or that Rice be substituted for Trimble. Instead, however, the court directed that the jury selection process be started over with the re-drawing of a panel of 18 from the full box, which was done. All of this took place before a jury of 12 was sworn to try the case.

It is conceded that until a jury has been sworn the trial court may in its discretion permit a late challenge for good cause. We see no reason why this principle should not extend to the whole process of challenging prospective jurors so long as there is no real or apparent prejudice. It is possible, of course, that unscrupulous counsel could practice some chicanery on the court in a situation like this, and get a second chance at striking a juror after gambling that he would be stricken by the other side, but we think that is the very area in which reliance must be placed on the good sense and discretion of the trial judge. Certainly there is no reason whatever to suspect any bad faith in this instance, and there is no indication of prejudice to the appellant. Ultimately the trial jury was

selected in accordance with KRS 29.270, and we find no error in that respect.

The facts developed by the evidence do not differ materially from the pretrial information recited in Gullett v. McCormick, Ky., 421 S.W.2d 352 (1967). Gullett was employed by McCormick to help move baled hay from a hay field to a barn located 1½ miles away. Gullett had never helped or worked for McCormick before, and he testified that he had no experience in hauling hay except that he had occasionally helped a neighbor with "just small loads of hay in front of the house." McCormick, on the other hand, had been hauling hay for several years. He supervised the loading and was the owner and driver of the truck, a 1949 model 1-ton flat-bed Chevrolet.

The accident happened while the third load was being transported from the field to the barn. For the first two trips the bales were stacked four deep, each layer running crosswise from the next but otherwise unsecured. McCormick, his two small children, and Gullett's 19-year old son Roger occupied the cab of the truck, and Gullett and four other young men rode on the hay. The first two trips were completed without incident. When the third load had been stacked four deep McCormick observed that by loading some additional bales he could finish the job in one more trip, so a partial fifth layer was put on top of the fourth.

In crossing a slight drain or depression in the field the truck stalled and had to be restarted, an incident which has significance only insofar as it may tend to support the testimony of Roger Gullett to the effect that as the truck approached the top of an embankment to get on the blacktop highway it stalled again and started "bogging and choking," whereupon, according to Roger (but denied by McCormick and his witnesses), McCormick "popped the clutch in and accelerated the engine. He did not ease the clutch back out and the hay went off." Roger says that when McCormick "popped the clutch" the truck lunged or jerked forward and McCormick said, "I bet I threw that load off." The fact is that part of the load did fall off the truck as it reached the blacktop, though McCormick says there was no clutching or jerking of the truck. Gullett also fell from the truck with the hay and sustained a fracture of the right tibial plateau, or upper end of the tibia.

■ McCormick submits that if the evidence is sufficient to support a case of negligence against him, then by the same token it also convicts Gullett of contributory negligence. Gullett, on the other hand, claims we crossed that bridge in Gullett v. McCormick, Ky., 421 S.W.2d 352 (1967), and points to the following language in the later case of Barnett v. Hendrix, Ky., 442 S.W.2d 312, 314 (1969):

"In both Gullett v. McCormick, Ky., 421 S.W.2d 352, and Roberts v. Davis, Ky., 422 S.W.2d 890, we held that a passenger riding on a farm truck on top of bales of hay was not contributorily negligent as a matter of law."

The substance of our holding in the first Gullett case was that Gullett's riding on top of the hay was not in itself a dispositive circumstance from which a judgment against him would ultimately and inevitably follow. Whether he was or was not negligent as a matter of law depended on the total circumstances that could be properly developed only by a trial. The trial has now taken place. It did not produce any further evidence from which it could be held as a matter of law that Gullett was negligent, and we so hold. In reaching this conclusion we attach importance to Gullett's professed lack of experience, which the jury was free to find as a fact. Surely it would be unreasonable to say that a danger that was not apparent to McCormick, a man of superior experience and in charge of the work, should have been obvious to Gullett. It was fairly a jury question and was submitted on a contributory negligence instruction.

The instructions allowed the jury to find McCormick negligent in either or both of two respects, (1) overloading the truck and (2) carelessly driving it. As McCormick rightly contends, there is no direct evidence that the truck was overloaded. There is, however, an amplitude of circumstantial evidence to that effect. The fact that on the first two trips when the bales were loaded to a depth of four layers they were safely hauled, but when a partial fifth layer was added for the next trip they fell off, permits a reasonable inference that the fifth layer was too much in view of the terrain over which the truck was required to travel and the absence of any devices to secure the load against shifting and falling. In this regard the case is not unlike Roberts v. Davis, Ky., 422 S.W.2d 890, 893 (1968), in which it was said that the falling of the hay, without an explanation of why it fell, raised an inference of negligence. It is our opinion that the instruction was proper in both aspects.

During the course of the trial Roger Gullett was cross-examined on the subject of a written statement he had signed about three months after the date of the accident, which statement was in some respects inconsistent with his testimony. In explaining, he said that the statement had been prepared by a third person and that he had signed it to accommodate McCormick. We quote his testimony as follows:

Q. "If these statements were not true at that time, why did you say at the end of it that it was true and sign your name to it?"

A. "Because James McCormick came down to the house right after the accident and talked to my father about it and said he wanted us to go in there—something about the Workmen's Compensation, about working so many guys and he told my Dad for us to make those statements and that he would be taken care of."

Q. "So you went down to somebody's office and you did sign your name to something that was not true?"

A. "Yes, sir, to help James McCormick out of what he had told us. He said my father would be taken care of."

Pursuing the same line, counsel for McCormick then questioned Roger Gullett as to why, when he signed the statement, he did not include certain material details which appeared in his affidavit made two years later in connection with McCormick's motion for a summary judgment, and again the witness explained as follows:

Q. "This affidavit was made in 1966. Why didn't you say that when you made this statement in December 14, 1963, before the lawsuit was brought?"

A. "Because I was going to talk as James McCormick's representative and I was informed by my father who was informed by James to help him out, to keep him from getting in trouble with Workmen's Compensation."

Q. "Do you know whether or not he ever had Workmen's Compensation?"

A. "I don't know that."

Q. "Did you know that if he had that it wouldn't affect his compensation one way or another?"

A. "I don't know that. All I did was go in there and told what I was supposed to tell to keep James McCormick out of trouble."

Our purpose in reciting this information about Roger's testimony is to provide the necessary background against which McCormick's next assignment of error must be considered. After this sparring and jousting in which Roger was put to the necessity of explaining why he had signed a statement in 1963 which did not conform to what he later said during the

course of the litigation, in the course of examining his mother counsel for Gullett undertook to corroborate Roger's explanation as follows:

Q. "There has been some testimony concerning Mr. McCormick worrying about some Workmen's Compensation. I will ask you whether or not you overheard any conversation between Mr. McCormick and your husband in which Workmen's Compensation was brought up?"

MR. VINCENT: "We object and move the court to set aside the swearing of the jury and continue this case because of bringing in Workmen's Compensation."

JUDGE ROBINSON: "Overruled."

Q. "Tell whether or not you overheard any conversation between your husband and Mr. McCormick concerning Workmen's Compensation?"

A. "Yes, I did."

Q. "You don't know the exact contents of that conversation, do you?"

A. "No, I don't."

McCormick contends that in this questioning of Mrs. Gullett the subject of insurance coverage was injected into the case and that a mistrial should have been declared. We do not agree. McCormick sought to impeach the credibility of Roger's testimony by use of the earlier statement. Certainly Roger was entitled to explain it and counsel was entitled to elicit evidence tending to corroborate the explanation. Moreover, for whatever it was worth the evidence had already been heard by the jury before Mrs. Gullett took the stand, and if there was any prejudice in it (which we doubt) the damage was done during the cross-examination of Roger and not in the questioning of Mrs. Gullett.

■ The last point is that the verdict is excessive. The jury awarded "$5119.70

for injury and $255.30 for medical bill and $2625.00 for loss of income," totalling $8,000. McCormick says first that the verdict was arrived at by lot, since it is obvious that the jury first decided on the over-all award of $8,000 and then arrived at the "injury" figure by subtracting the sum of the special damages from $8,000. We do not consider this process to be a verdict by lot, nor can we say it is wrong. The fixing of an award for personal injuries is pretty much a matter of guesswork at best.

■ Next it is argued that the verdict is excessive because Gullett did not submit to certain surgery recommended by his physician and thus failed to minimize his damages. Cf. Carney v. Scott, Ky., 325 S.W.2d 343 (1959). We are of the opinion for several reasons that this position is not well taken. For one thing, the doctor who recommended the surgery testified that whether and the extent to which it would have been successful is "only a matter of conjecture." The most he would say was that in his opinion Gullett "would be better with the operation than without it." He was the only medical witness. If he could not say how much Gullett's condition would have been ameliorated by the operation, neither could the jury. For another, it is obvious from the nature of the recommended surgery, which involved a bone graft, that the necessity of being subjected to it would itself have constituted a major item of damage to the injured man. Had he undergone the operation and recovered fully and promptly, an award of $5,119 would still have been modest. He had a serious injury, resulting in a loss of work for five months. The residual effects include traumatic arthritis. He says he cannot walk normally. The instructions permitted recovery for permanent impairment of his power to earn money, to which element no specific objection was made within the meaning of CR 51(3). It is our opinion that the evidence was abundantly sufficient to support the amount of the verdict.

Another argument made in support of the contention that the award was excessive is that Gullett did not introduce any statement from his employer, Armco Steel Corporation, supporting his own testimony as to lost wages, and that it is a matter of common knowledge that this company provides sick pay and hospital benefits for its employes. Whether sick pay and hospital benefits would be deductible from the amount of special damages Gullett was entitled to recover is a question we do not reach, since there was no evidence in that respect. With respect to hospital benefits, however, see Conley v. Foster, Ky., 335 S.W.2d 904 (1960). Armco's personnel policies are not a proper subject of judicial notice, and its records were just as available to McCormick as they were to Gullett.

The judgment is affirmed.

All concur.